United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

AUTOMATTIC INC., et al.,

          Plaintiffs,

    v.

NICK STEINER,

          Defendant.

Case No.  13-cv-05413-JCS

**REPORT AND RECOMMENDATION RE MOTION FOR DEFAULT JUDGMENT**

**Dkt. No. 22**

## I.   INTRODUCTION

This action arises under subsection (f) of the Digital Millennium Copyright Act, 17 U.S.C. § 512 ("DMCA"), which provides a cause of action against any person who "knowingly materially misrepresents" that material or activity infringes a copyright to utilize the DMCA's takedown notice procedures.  *See* 17 U.S.C. § 512(f).  Plaintiffs Automattic Inc. ("Automattic") and Oliver Hotham ("Hotham") allege that Defendant Nick Steiner ("Defendant") violated subsection 512(f) by knowingly misrepresenting that Hotham published material on Automattic's website that infringed Defendant's copyright.  Defendant has not filed an answer or otherwise responded to this action, and default has been entered by the clerk.  Docket No. 21.

On May 22, 2014, Plaintiffs filed a Motion for Default Judgment ("Motion").  A hearing was held at which the Court requested supplemental evidence regarding damages.  For the reasons explained below, it is recommended that Plaintiffs' Motion for Default Judgment be GRANTED.

United States District Court
Northern District of California

## II.    BACKGROUND

### A.    Digital Millennium Copyright Act ("DMCA"),

Congress passed the DMCA in 1998, adding § 512 to Title 17 of the U.S. Code.  *See* 17 U.S.C. § 512.  The purpose of the DMCA was to create an environment that facilitated electronic commerce, digital technology, and expression while protecting intellectual property rights.  S. Rep. No. 105190, at 2 (1998).  Subsection 512(c) provides a detailed procedure through which a copyright owner may request removal of infringing content from a web-publishing platform.  *Id.* § 512(c).  If a copyright owner believes in good faith that content is infringing, the owner may send a "takedown notice" to the service provider pursuant to subsection 512(c)(3), and the service provider then must remove or disable access to the material "expeditiously" or face infringement liability itself.  *Id.* §§ 512(c)(1)(C), (c)(3).

The DMCA also creates liability for individuals who abuse the takedown notice system by filing meritless claims of infringement.  17 U.S.C. § 512(f).  Subsection 512(f) provides that any person who makes knowing, material misrepresentations in filing a DMCA takedown notice "shall be liable for any damages, including costs and attorneys' fees[] incurred by the alleged infringer . . . or by a service provider . . . ."  *Id.*

### B.    Factual Allegations & Evidence re Takedown Notices

Hotham is a student journalist residing in London who maintains a blog on WordPress.com, a web-publishing platform operated by Automattic.  Compl. ¶¶ 10, 12–13.  Automattic is a corporation based in San Francisco that operates WordPress as an open source for users to "work on, change or contribute to" in an effort to "empower a community of bloggers."  Sieminski Decl. (Dkt. 22-6) ¶¶ 13–14.  While Automattic's free and user-friendly hosting of digital content promotes expression, it also creates potential for copyright infringement.  *See Doe v. Geller*, No. 07–2478 VRW, 533 F. Supp. 2d 996, 1001 (N.D. Cal. Feb. 4, 2008) (finding potential for copyright and trademark infringement in content hosted by YouTube).

In May or June of 2013, Hotham read an article about an organization called Straight

United States District Court
Northern District of California

Pride UK on the blog BuzzFeed.  Compl. ¶ 21.  On July 26, 2013, Hotham contacted Straight

Pride UK, identifying himself as "a student and freelance journalist."  Compl. ¶ 22.  Hotham

asked if he could send Straight Pride UK "some questions about [the] organisation . . . to find out

a bit about who's involved and what [it] hope[d] to accomplish."  *Id.*

On July 29, 2013, a staffer from Straight Pride UK responded affirmatively, and Hotham

promptly sent a list of questions.  Compl. ¶¶ 23–24.  Defendant responded to Hotham's questions

on August 1, 2013.  Compl. ¶ 25.  In his email response, Defendant identified himself as the

"Press Officer" for Straight Pride UK, and attached a PDF file named "Press Statement – Oliver

Hotham.pdf."  Compl. ¶ 26, Ex. A ("Press Statement").

On August 3, 2013, Hotham posted an article to his blog on WordPress in which he

discussed the information provided by Straight Pride UK in the Press Statement.  Hotham wrote:

> There has never been a better time to be gay in this country. LGBTI people will
> soon enjoy full marriage equality, public acceptance of homosexuality is at an all
> time high, and generally a consensus has developed that it's really not that big of
> a deal what consenting adults do in the privacy of their bedrooms. The debate on
> Gay Marriage in the House of Commons was marred by a few old reactionaries,
> true, but generally it's become accepted that full rights for LGBTI people is
> inevitable and desirable. Thank God.
>
> But some are deeply troubled by this unfaltering march toward common decency,
> and they call themselves the Straight Pride movement.
>
> Determined to raise awareness of the "heterosexual part of our society", Straight
> Pride believe that a militant gay lobby has hijacked the debate on sexuality in this
> country, and encourage their members, among other things, to "come out" as
> straight, posting on their Facebook page that:
>
> "Coming out as Straight or heterosexual in todays politically correct world is an
> extremely challenging experience. It is often distressing and evokes emotions of
> fear, relief, pride and embarrassment."
>
> I asked them some questions.

Compl. ¶ 29.  Hotham also posted the questions he sent to Straight Pride UK and the

corresponding answers in the Press Statement.  Compl. ¶ 30.

On the same day that Hotham posted the article on the blog at WordPress, Defendant sent

an email to both Hotham and Automattic with the subject line: "Digital Millennium Copyright

Act - Removal Request".  Compl. ¶ 31.  Defendant wrote:

> Digital Millennium Copyright Act – Removal Request
>
> This letter is official notification under the provisions of Section 512(c) of the Digital Millennium Copyright Act ("DMCA") to effect removal of the above-reported infringements.
>
> It is requested that you immediately remove any posts and or images including this one http://oliverhotham.wordpress.com/2013/08/03/its-great-when-youre-straight-yeah/ and http://oliverhotham.files.wordpress.com/2013/08/straight-pride-website.jpg from your website, it is advised that this post and image is 'Powered by Wordpress.'
>
> User http://oliverhotham.wordpress.com did not have my permission to reproduce this content, on Wordpress.com or twitter account or tweets, no mention of material being published was made in communications.
>
> Copies of this page have been taken and you shall receive a formal letter should this post not be removed within 24 hours from your blog.  A DMCA has also submitted with a copyright breach to your website company.
>
> Please be advised that law requires you, to "expeditiously remove or disable access to" the infringing photographs, images and blog text upon receiving this notice.  Non-compliance may result in a loss of immunity for liability under the DMCA and will result in legal action for Copyright Breach and possible defamation.
>
> It is of good faith belief that use of the material in the manner complained of here is not authorized by me, the copyright holder, or the law.  The information here is accurate to the best of my knowledge.  It is hereby sworn under penalty of perjury that the copyright holder of the said text, article and image that are in the website post and format.
>
> Please send at the address noted below a prompt response indicating the actions you have taken to resolve this matter.
>
> Sincerely,
>
> For the Straight Forward Project

Gratz Decl. (Dkt. 22-1) Ex. B.

Automattic responded to Defendant and informed him that the "DMCA Takedown

Notice has been received and reviewed for completeness," and that Automattic "disabled access

to the material identified as infringing." *Id*.  Automattic also informed Defendant that Hotham would have an opportunity to formally challenge this removal.  *Id*.  Plaintiffs allege that Automattic disabled access to Hotham's blog post in reliance on Defendant's takedown notice. *See* Compl. ¶ 36 ("But for those misrepresentations, Automattic would not have disabled access to the post identified in the notice.").

Following the removal of his blog post, it appears that Hotham posted more content to his blog on Wordpress pertaining to the Press Statement.   *See* Gratz Decl., Exs. C, D.  On August 12, 2013, Defendant notified Automattic that "Mr Hotham has now put up another post here: http://oliverhotham.wordpress.com/2013/08/11/the-sordid-take-of-how-i-was-censored-by-straight-pride-uk/."  Gratz Decl., Ex. C.  Defendant claimed that "Mr Hotham is perusing [sic] a code of conduct that amounts to harassment, and is encouraging others to harass us and repost his [blog] which contains our name, links and wording to their blogs hosted on wordpress.com." *Id*.  Automattic wrote the following in response to Defendant's second email:

> WordPress.com is in no position to arbitrate content disputes or make any form of legal judgment on allegations or claims.  Please provide us with a formal court order including a court's decision regarding this particular content; if any content is found to be defamatory or illegal by a court of law, it will be removed immediately from the WordPress.com service.

*Id*.

On August 14, 2014, Defendant sent a third email asking Automattic again to take down certain content posted by Hothman.  Gratz Decl., Ex. D.  Defendant wrote that he had "a good faith belief that use of the copyrighted materials described above as allegedly infringing is not authorized by the copyright owner, its agent, or the law."  *Id*.  In response to Defendant's third email, Automattic informed Defendant that "the DMCA Takedown Notice you have submitted is incomplete," and asked Defendant to resubmit the takedown notice with additional information. *Id*.

Plaintiffs allege Automattic expended staff time and resources in reviewing the takedown notices, disabling Hotham's posts, notifying Hotham of the takedown notices, handling requests

United States District Court
Northern District of California

for comment from press, and pursuing the instant action.  Compl. ¶¶ 37-38.  Plaintiffs also allege that Hotham expended time and resources corresponding with Automatitic about the takedown notice and addressing this dispute.  *Id*. ¶¶ 39.  Further, Hotham alleges that his free speech rights have been chilled.  *Id*. ¶ 40.

### C.    Procedural History

Plaintiffs filed this action for misrepresentation under 17 U.S.C. § 512(f) against Defendant on November 21, 2013.  On December 10, 2013, Plaintiffs filed a Motion for an Extension of Time to serve Defendant in the United Kingdom.  Dkt. No. 10.  The court granted Plaintiffs' motion, and Plaintiffs served Defendant on December 23, 2013.  *See* Dkt. No. 14 (Summons); Gratz Decl., Exs. B, D.

Defendant's answer was due on January 13, 2014.  *See* Fed. R. Civ. P. 12(a)(1)(A)(i).  Defendant has not filed an answer to the Complaint or otherwise appeared in this action.  On May 20, 2014, the Clerk entered default against Defendant.  Dkt. No. 21.  On May 22, 2014, Plaintiffs filed a Motion for Default Judgment against Defendant.  Dkt. No. 22.   The Court held a hearing, and Plaintiffs have since submitted supplemental declarations.

## III.    DISCUSSION

### A.    Adequacy of Service

Courts must determine the adequacy of service of process on a motion for default judgment.  *Bank of the West v. RMA Lumber Inc.*, No. 07-6469 JSW, 2008 WL 2474650, at *2 (N.D. Cal. June 17, 2008).  The Proof of Service in this case shows that a process server, Rick Hamilton of ABC Legal Services, sent the complaint, summons and other relevant documents to the "English Authorities," which in turn served the documents by "posting them through defendant's letterbox."  Dkt. No. 14 at 2 (Proof of Service).  The following address was provided to the English authorities:

> Nick Steiner
> New House
> 67-68 Hatton Garden
> London, England EC1N8JY

*Id*. at 1 (Summons); *see also* Dkt. No. 14-2.  This was the address of The Straight Forward Project that was provided by Defendant in his communications with Automattic.  *See* Gratz Decl., Exs. B, D.  There is no indication from those communications that this address is Defendant's personal residence.

Service outside of the United States must be done in accordance with Rule 4(f) of the Federal Rules of Civil Procedure.  Rule 4(f)(1) provides that an individual "may be served at a place not within any judicial district of the United States . . . by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents."  Fed. R. Civ. P. 4(f)(1).

In *Brockmeyer v. May*, the Ninth Circuit wrote that "Rule 4(f)(1) authorizes service by those methods of service authorized by international agreements, including the Hague Convention." 383 F.3d 798, 804 (9th Cir. 2004).  The court continued:

> The Hague Convention affirmatively authorizes service of process through the Central Authority of a receiving state.  Rule 4(f)(1), by incorporating the Convention, in turn affirmatively authorizes use of a Central Authority.  However, Rule 4(f)(1) does not go beyond means of service affirmatively authorized by international agreements.

*Id*.  Because it was "undisputed that Brockmeyer did not use either the Central Authority under the Hague Convention or any other internationally agreed means for accomplishing service," the court found that Rule 4(f)(1) did not provide a proper basis for service.  *See id*.

The Hague Convention provides that "[e]ach Contracting State shall designate a Central Authority which will undertake to receive requests for service coming from other contracting States."  Hague Convention Art. 2.  "The Central Authority then may serve the document itself, or have it served by a method prescribed by its internal law for the service of documents in domestic actions upon persons within its territory."  *Id*. at art. 5.  The Central Authority must

7

United States District Court
Northern District of California

1   complete a certificate confirming the "method, the place and the date of service and the person to

2   whom the document was delivered." *Id.* at art. 6.

3          Plaintiffs present three documents to support that Defendant was served in compliance

4   with the Federal Rules of Civil Procedure and the Hague Convention.  First, the American Proof

5   of Service shows that a process server, Rick Hamilton of ABC Legal Services, sent the

6   Complaint, Summons and other relevant documents to the "English Authorities," which in turn

7   served the documents by "posting them through defendant's letterbox."  Dkt. No. 14 at 2 (Proof

8   of Service).  Next, Plaintiffs provide a copy of the USM–94, Request for Service Abroad of

9   Judicial or Extrajudicial Documents.  Dkt. No. 14-1.  Use of this form accompanying American

10   judicial process is a recognized procedure by foreign Central Authorities for a "private litigant

11   who wishes to effect service in a foreign country pursuant to the Hague Convention."[1]

12          Finally, Plaintiffs show that service complies with Article 5 because Plaintiffs provide a

13   Certificate establishing that service was delivered by a designated United Kingdom Central

14   Authority.  *See* Dkt. No. 14-2 (Certificate).  Specifically, the Certificate is stamped by the

15   Foreign Process Section of the Senior Courts of England and Wales, which is a Central Authority

16   identified by the Hague Convention.[2]

17          Further, the Certificate complies with Article 6 because it states the "method, the place

18   and the date of the service and the person to whom the document was delivered."  *Id.* at art. 6.

19   The Certificate provides that on December 23, 2013, the documents were served "by posting

20   them through the defendant's letterbox" to the address of The Straight Forward Project that was

21   provided by Defendant in his communications with Automattic.  Dkt. No. 14-2; *see* Gratz Decl.,

22   Exs. B, D.  In the Ninth Circuit, a Certificate accurately executed by Central Authority

23   "constitutes prima facie evidence of valid service which can only be overcome by strong and

---

[1] *U.S. Marshals Service*, The U.S. Dept. of Justice,
http://www.usmarshals.gov/process/foreign_process.htm (last visited July 8, 2014).
[2] *See Hague Conference: United Kingdom - Central Authority & practical information,
Authorities*, http://www.hcch.net/index_en.php?act=authorities.details&aid=278 (last visited July
29, 2014).

United States District Court
Northern District of California

convincing evidence." *Oak Point Partners, Inc. v. Lessing*, No. 11–3328–LHK, 2012 WL 4121109 *1, 2 (N.D. Cal. Sept. 18, 2012) (citing *S.E.C. v. Internet Solutions for Bus. Inc*, No. 06-15204, 509 F.3d 1161, 1166 (9th Cir. 2007)).  The Court is aware of no such countervailing evidence in this case.

The Court finds that Plaintiffs adequately served the Defendant through use of a designated Central Authority under article 18 of the Hague Convention in compliance with Rule 4(f)(1) of the Federal Rules of Civil Procedure.

### B.    Personal Jurisdiction

When entry of judgment is sought against a party who has failed to plead or otherwise defend, a district court has the affirmative duty to determine whether it has jurisdiction over the subject matter and the parties.  *In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999).  Subject matter jurisdiction is proper under 28 U.S.C. § 1331 because Plaintiffs' claim arises under the DMCA, a federal statute.  Plaintiffs allege that Defendant is subject to personal jurisdiction on two independently sufficient bases:  (1) consent by agreement to the WordPress Terms of Service, and (2) specific jurisdiction through minimum contacts with the State of California.

### i.    Consent by Agreement to the WordPress Terms of Service

Plaintiffs present evidence that Defendant consented to personal jurisdiction when he accepted the WordPress Terms of Service in order to file his takedown notice.  Plaintiffs state that Defendant's second and third takedown notices show that Defendant was logged in as a WordPress.com user.  Sieminski Decl. ¶ 12; Gratz Decl., Exs. C, D.   Plaintiffs further state that Defendant could not have become a WordPress.com user without accepting the WordPress.com terms of service.  *Id*.

Plaintiffs present evidence that WordPress's terms of service include a forum-selection clause identifying "state and federal courts located in San Francisco County, California" as the "proper venue for disputes arising" from use of WordPress.  Gratz Decl., Ex. A ¶ 20.  Plaintiffs argue that acceptance of a forum-selection clause is evidence of consent to personal jurisdiction in that forum, and the Court may therefore properly exercise jurisdiction over the Defendant.

Mot. at 7.

In *S.E.C. v. Ross*, the Ninth Circuit wrote that, "[i]n general, . . . a party has consented to personal jurisdiction when the party took some kind of affirmative act—accepting a forum selection clause, submitting a claim, filing an action—that fairly invited the court to resolve the dispute between the parties." 504 F.3d 1130, 1149 (9th Cir. 2007) (citations omitted); *see also Dow Chem. Co. v. Calderon,* 422 F.3d 827, 831 (9th Cir. 2005); *Tucker Plastics, Inc. v. Pay'N Pak Stores, Inc.*, 99 F.3d 910, 911(9th Cir.1996) (per curiam)).  This Court has previously applied *S.E.C v. Ross* to hold that an assertion of rights can constitute the type of "affirmative act" contemplated in *Ross* to constitute consent to personal jurisdiction.  *See Crunchyroll, Inc. v. Pledge*, C 11-2334 SBA (JCS), 2014 WL 1347492, at *9 (N.D. Cal. Mar. 31, 2014) (adopting report and recommendation finding the submission of a counter-notification to YouTube to be an affirmative assertion of rights to constitute consent to personal jurisdiction).

Here, Defendant's conduct of accepting the terms of service is sufficient to constitute consent to personal jurisdiction in California.  *See Ross*, 504 F.3d 1130; *Craigslist, Inc. v. Naturemarket, Inc.*, No. C 08-5065 PJH, 694 F. Supp. 2d 1039, 1052–53 (N.D. Cal. 2010) ("the [c]ourt may properly exercise personal jurisdiction over Defendants based on their consent to the forum selection clause in the [terms of use agreement]").  In becoming a user of WordPress, Defendant accepted terms of service that read, "[b]y accessing or using any part of the web site, you agree to become bound by the terms and conditions of this agreement."  *See* Gratz Decl., Ex. A at 2.  The terms of service include a forum selection clause selecting this forum.  Under *Ross*, this constitutes sufficient evidence that Defendant has consented to jurisdiction in this forum. *Ross*, 504 F.3d at 1149.

### ii.    Specific Jurisdiction

Plaintiffs also argue that the Court's exercise of personal jurisdiction over Defendant is proper because the Defendant has sufficient minimum contacts in California.  Mot. at 8. Plaintiffs argue that Defendant purposefully directed his activities toward California in filing a takedown notice pursuant to the DMCA, a United States law, against Plaintiff Automattic, a

United States District Court
Northern District of California

California-based company. *Id.* Plaintiffs contend that their claim arises out of Defendant's action in California because he sent his allegedly fraudulent takedown notice to Automattic, and Automattic is located in California. *Id.* Plaintiffs argue that because Defendant invoked the laws of the United States to allegedly commit fraud upon Automattic in California, it is reasonable to exercise jurisdiction over the Defendant. *Id.* at 9.

"Because California's long-arm jurisdictional statute is coextensive with federal due process requirements, the jurisdictional analyses under state law and federal due process are the same." *Dole Food Company, Inc. v. Watts*, 303 F.3d 1104, 1110 (9th Cir. 2002) (citing Cal. Code Civ. Proc. § 410.10)). The exercise of specific jurisdiction over a nonresident defendant requires the satisfaction of the three following factors:

> (1) the non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Dole Food*, 303 F.3d at 1111 (internal quotations and citations omitted). "The plaintiff bears the burden of satisfying the first two prongs of the test." *Id.* (citations omitted). "If the plaintiff fails to satisfy either of these prongs, personal jurisdiction is not established in the form state." *Id.* "If the plaintiff succeeds in satisfying both of the first two prongs, the burden then shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be reasonable." *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476-78 (1985)).

"The first prong of the specific jurisdiction test refers to both purposeful direction and purposeful availment." *Mavrix Photo, Inc. v. Brand Technologies, Inc.*, 647 F.3d 1218, 1228 (9th Cir. 2011). In cases involving tortious conduct, "purposeful direction is the proper

analytical framework." *Id*. (internal quotation omitted).  Here, purposeful direction is the proper analytical framework to analyze the first prong of the specific jurisdiction test because the claim of misrepresentation under the DMCA is a "tort-like cause of action."  *See id.* (claim of copyright infringement is "tort-like cause of action" to invoke purposeful direction framework of analysis for specific jurisdiction).

To determine whether a defendant "purposefully directs his activities at a forum state," courts apply the "effects" test from the Supreme Court's decision in *Calder v. Jones*.  465 U.S. 783 (1984).  The "effects" test requires that "the defendant allegedly must have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1128 (9th Cir. 2010) (quotations omitted).

In the Ninth Circuit, the intentional act element requires "an intent to perform an actual, physical act in the real world, rather than an intent to accomplish a result or consequence of that act." *Brayton*, 606 F.3d at 1128.  Here, the intentional act element is satisfied because Defendant acted intentionally when he sent takedown notices to Automattic.  *See id.* at 1128–29 (creating and posting infringing material to a website is an intentional act); *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.,* 223 F.3d 1082, 1088 (9th Cir.2000) (sending a letter was an intentional act).  Further, Plaintiffs allege that Defendant intentionally misrepresented that Hotham's use of content contained in the Press Statement was unauthorized.  *See Dole Food*, 303 F.3d at 1111 ("Because it is clear that [Plaintiff] has sufficiently alleged that [defendants] acted intentionally, we skip to the 'express aiming requirement.'").

The second element of the "effects" test requires "something more" than a "foreign act with foreseeable effects in the forum state" to justify the assertion of personal jurisdiction. *Bancroft*, 223 F.3d 1087 at 1087.  Courts routinely interpret that "something more" to be satisfied when conduct is "expressly aimed" at the forum state.  *Id.*  ("We now conclude that 'something more' is what the Supreme Court described as 'express aiming' at the forum state.")  The "express aiming" requirement "is satisfied when the defendant is alleged to have engaged in

United States District Court
Northern District of California

wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident of the forum state." *Id.*; *see also Dole Food*, 303 F.3d at 1112 ("Because [defendants] knew that Dole's principal place of business was in California, and communicated directly with those California decision makers, we conclude that their actions were 'expressly aimed' at the forum state."); *Data Disc, Inc. v. Sys. Tech. Assoc.*, 557 F.3d 1280, 1288 (9th Cir. 1977) ("The inducement of reliance in California is a sufficient act within California to satisfy the requirement of minimum contacts where the cause of action arises out of that inducement.").

In *Bancroft*, the defendant sent a letter to the Virginia headquarters of plaintiff, a California-based corporation, requiring that plaintiff sue defendant or lose rights to their domain name. *Bancroft*, 223 F.3d at 1087. The defendant knew that the plaintiff held the domain name, and that the letter would have legal implications for the plaintiff. *Id.* at 1088. In considering whether California had specific jurisdiction over defendant, the court found it irrelevant that the letter was sent to Virginia, rather emphasized that in sending the letter, the defendant's conduct had the purpose to affect or "individually target[ed]" the plaintiff. *Id.* at 1087–88. By "individually targeting" the plaintiff, who was a resident of California, the defendant's conduct demonstrated "something more" than a mere "foreign act with foreseeable effects in the forum state." *Id.*; *see also Panavision*, 141 F.3d at 1321 ("deliberate choice of plaintiff's trademark, and his subsequent attempts to extort compensation for [] conveyance of [a] domain name, targeted that individual plaintiff."); *Metro. Life Ins. Co. v. Neaves*, 912 F.2d 1062, 1065 (9th Cir. 1990) ("critical factor" in sending a letter misrepresenting entitlement to insurance payment was that defendant "was purposefully defrauding [plaintiff] in California.").

Here, the Court finds that Defendant's sending the takedown notice to Automattic with the knowledge and purpose that it would induce Automattic to remove content from Wordpress "individually targeted" Automattic and thus constituted conduct "expressly aimed" at California. The plain text of each takedown notice demonstrates that Defendant emailed each directly to Automattic with the purpose of forcing Automattic to remove content from Wordpress. *See* Gratz Decl. Exs. B, C, D. The first takedown notice contained the subject line "Digital

13

United States District Court
Northern District of California

Millennium Copyright Act – Removal Request." *Id.* Ex. A.  The body of the request identified

specific "posts and or images" hosted by Wordpress and expressly requested Automattic

promptly remove them or face potential "liability under the DMCA." *Id.*  The subsequent

takedown notices similarly requested Automattic remove specific content or face legal liability.

*See id.* Exs. C, D.  Like the letter sent to plaintiff in *Bancroft*, Defendant's clear attempt to force

action by Automattic or face legal consequences "individually targeted" Automattic, and thus

constituted "something more" than an act with merely foreseeable effects in California.  *See*

*Bancroft*, 223 F.3d at 1087.  Thus, Defendant's conduct with the purpose of forcing Automattic

to act constituted "individualized targeting" to satisfy "express aiming" at the forum state to

justify specific jurisdiction over the Defendant.

The final element of the *Calder* "effects" test is satisfied if Plaintiff can show that "a

jurisdictionally sufficient amount of harm is suffered in the forum state."  *Yahoo! Inc. v. La*

*Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1210 (9th Cir. 2006) (*en banc*)

(overruling prior decisions which required "the 'brunt' of the harm" to be suffered in the forum

state).  The Ninth Circuit has relied on a corporation's principal place of business in determining

the location of its economic injury.  *See Dole Food*, 303 F.3d at 1114.  "[W]hen a forum in

which a plaintiff corporation has its principal place of business is in the same forum toward

which defendants expressly aim their acts, the 'effect' test permits that forum to exercise

personal jurisdiction."  *Id*.  In *Dole Food*, the Ninth Circuit held that, where the defendants had

expressly aimed their conduct at the same forum where plaintiff had its principal place of

business, the plaintiff suffered a jurisdictionally sufficient amount of harm in the forum state.  *Id*.

Automattic's principal place of business is California, which is the location of its economic

injury.  Compl. ¶ 3.  Plaintiffs allege that as a result of Defendant's fraudulent conduct,

Automattic spent substantial time and resources in dealing with the "meritless" takedown notices

and suffered reputational harm amounting to a total of $8,860 in damages.  Siemski Supp'l

Decl. (Dkt. 28-4) ¶ 28.  The Court finds that the foregoing constitutes a "jurisdictionally

sufficient" amount of harm suffered by Automattic in California to satisfy the final element of the "effects" test.

Having found that Plaintiffs have met their burden in establishing the first prong of specific personal jurisdiction, the Court considers whether the claim is "one which arises out of or relates to the defendant's forum-related activities." *Dole Food*, 303 F.3d at 1111. Here, the claim for misrepresentation under § 512(f) directly relates to the takedown notices sent by Defendant to Automattic in California. Accordingly, the second prong for specific personal jurisdiction is also satisfied.

Because Plaintiffs have satisfied the first two prongs of the specific jurisdiction analysis, "the burden then shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be reasonable." *Id*. (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476−78 (1985)). Defendant has not appeared in this action, and therefore, has made no "compelling case" against the exercise of personal jurisdiction on grounds of reasonableness. Accordingly, there is personal jurisdiction over Defendant in this case.

As a final point, Plaintiffs correctly distinguish the instant case from *Geller*, where the Northern District declined to exercise specific personal jurisdiction over a foreign defendant who sent a DMCA takedown notice to a California-based company. *See Geller*, 533 F. Supp. 2d 996. In *Geller*, the plaintiff, a resident of Pennsylvania, alleged that defendants, both residents of England, sent a takedown notice to YouTube that "knowingly materially misrepresent[ed]" that material infringed a copyright in violation of § 512(f). *Id.* at 1003; 17 U.S.C. § 512(f). The court declined to exercise personal jurisdiction over the defendants because the plaintiffs did not sufficiently allege how the act of removing the video in California by YouTube, not a party to the dispute, demonstrated injury to plaintiff in California rather than in plaintiff's residence state of Pennsylvania. *Id.* at 1006. Unlike the Pennsylvania-based plaintiff in *Geller* unlikely to sustain injury in California, Plaintiff Automattic has its principal place of business and alleges economic and reputational damages in California. Compl. ¶ 3; Mot. at 10, 11.

United States District Court
Northern District of California

United States District Court
Northern District of California

C.      **Motion for Default Judgment**

i.      **Legal Standard**

After default has been entered against a party, a court may grant default judgment in its discretion.  If the court is satisfied that jurisdiction is proper and that service of process upon the defendant was adequate, courts are instructed to consider several factors in determining whether to grant default judgment:

> (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action, (5) the possibility of a dispute concerning material facts, (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

*Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986).  In making its decision, the court takes all factual allegations in the complaint, except those relating to damages, as true.  *TeleVideo Systems, Inc. v. Heidenthal*, 826 F.2d 915, 917-18 (9th Cir. 1987) (citing *Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977)).  The scope of relief "must not differ in kind from, or exceed in amount, what is demanded in the pleadings."  Fed.R.Civ.P. 54(c).

ii.     ***Eitel* Analysis**

a.      <u>Sufficiency of Complaint</u>

In considering the sufficiency of the complaint, the Court looks to the Plaintiffs' allegations to determine whether they "state a claim on which the [plaintiff] may recover."  *See Kloepping v. Fireman's Fund*, No. 94-2684 TEH, 1996 WL 75314, at *2 (N.D. Cal. Feb. 13, 1996) (citing *Danning v. Lavine,* 572 F.2d 1386, 1388 (9th Cir. 1978)).  Section 512(f) provides:

> Any person who *knowingly materially misrepresents* under this section--
>       (1) that material or activity is infringing, or
>       (2) that material or activity was removed or disabled by mistake or misidentification,
> shall be liable for any damages, including costs and attorneys' fees, incurred by the alleged infringer, by any copyright owner or copyright owner's authorized licensee, or by a service provider, who is *injured* by such misrepresentation, as the result of the service provider *relying* upon such misrepresentation in removing

16

1

> or disabling access to the material or activity claimed to be infringing, or in replacing the removed material or ceasing to disable access to it.

2

3  17 U.S.C. § 512(f) (emphasis added).  Thus, to state a claim for misrepresentation under

4  § 512(f), Plaintiffs must allege that Defendant "knowingly and materially misrepresent[ed]" that

5  copyright infringement has occurred, that Automattic "relied" on such misrepresentations, and

6  that Plaintiffs have been "injured" as a result.  *See Online Policy Grp. v. Diebold, Inc.*, 337 F.

7  Supp. 2d 1195, 1204 (N.D. Cal. 2004) (Fogel, J.) (noting that "the statutory language [of

8  § 512(f)] is sufficiently clear on its face and does not require importation of standards from other

9  legal contexts.").

10      "[K]nowingly means that a party actually knew, should have known if it acted with

11  reasonable care or diligence, or would have had no substantial doubt had it been acting in good

12  faith, that it was making misrepresentations."  *Diebold, Inc.*, 337 F. Supp. 2d at 1204 (citing

13  Black's Law Dictionary (8th ed. 2004) (definitions of "knowledge," in particular, "actual" and

14  "constructive" knowledge)).  In *Diebold*, the court found that the defendant made a knowing

15  misrepresentation because "[n]o reasonable copyright holder could have believed that the

16  portions of the email archive . . . were protected by copyright," and because the defendant

17  specifically intended the takedown notice to result in the prevention of publication of certain

18  content.  *Diebold, Inc.*, 337 F. Supp. 2d at 1204.  Similarly, here, the Court finds that Defendant

19  knowingly misrepresented that Hotham violated his copyright because Defendant could not have

20  reasonably believed that the Press Release he sent to Hotham was protected under copyright.

21  Moreover, there can be no dispute that Defendant knew, and indeed, specifically intended, that

22  the takedown notice would result in the disabling of Hotham's article.  *See id.*

23      Defendant's misrepresentations must have also been "material," which means that the

24  misrepresentation affected Automattic's response to the takedown notices.  *Diebold, Inc.*, 337 F.

25  Supp. 2d at 1204.  In *Diebold*, the court found materiality by the fact the misrepresentations

26  "resulted in the removal of the content from websites and the initiation of the present lawsuit."

27  *Diebold, Inc.*, 337 F. Supp. 2d at 1204.  Plaintiffs allege that Defendant's misrepresentations

28

United States District Court
Northern District of California

17

induced Automattic to disable Hotham's article.  Compl. ¶ 35.  This is sufficient to satisfy the element of materiality.

Plaintiffs also allege that Automattic relied on Defendant's misrepresentations, and that they have been injured as a result.  *See* Compl. ¶¶ 36-40.  These allegations are presumed true on a motion for default judgment.  Accordingly, the Court finds the Complaint to be sufficient, and that this factor weighs in favor of default judgment.

b.  Merits of the § 512(f) Claim

The fact Defendant made his misrepresentations in London and not in the United States may present a challenge to the merits of Plaintiffs' § 512(f) claim.  "It is a 'longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States."  *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010) (quoting *EEOC v. Arabian Am. Oil Co.,* 499 U.S. 244, 248 (1991)).  "This principle represents a canon of construction, or a presumption about a statute's meaning," and "rests on the perception that Congress ordinarily legislates with respect to domestic, not foreign matters."  *Id.* (citations omitted).  "When a statute gives no clear indication of an extraterritorial application, it has none."  *Id.*

In *Morrison*, the Supreme Court considered whether section 10(b) of the Securities and Exchange Act of 1934 applied extraterritorially.  *Morrison*, 561 U.S. at 255.  The plaintiffs, all Australian nationals, had purchased stock in an Australian bank on an Australian stock exchange.  *Id.* at 251.  Plaintiffs alleged that representatives of the bank's American subsidiary in the United States made fraudulent statements making some of the subsidiary's assets to appear more valuable than they actually were.  *Id.* at 253.

Emphasizing the presumption against extraterritorial application of domestic laws, the Court found that the plaintiffs did not have a cause of action under section 10(b).  *Id.* at 273.  The Court stated that "[w]hen a statute gives no clear indication of an extraterritorial application, it has none."  *Id.* at 255.  Looking to the language of the Exchange Act, the Court concluded that the "objects of the statute's solicitude" were "transactions in securities listed on domestic

United States District Court
Northern District of California

exchanges, and domestic transactions in other securities" and that it was "those transactions "
and "parties to those transactions that the statute seeks to regulate." *Id.* at 267. Importantly, the
Court held that the "focus of the Exchange Act [was] not upon the place where the deception
originated, but upon purchases and sales of securities in the United States." *Id.* at 266.

A court from the Central District of California considered the application of *Morrison* in
the context of a statute prohibiting the trafficking of people into the United States. *See Tanedo v.
E. Baton Rouge Parish Sch. Bd.*, C-10-1172 JAK, 2012 WL 5378742 (C.D. Cal. Aug. 27, 2012).
In *Tanedo*, the court considered the scope of extraterritoriality in applying the Trafficking
Victims Protection Act ("TVPA"), 18 U.S.C. § 1595, when elements of the trafficking occurred
abroad. *Id.* at 6. Applying *Morrison,* the court looked to the text of the TVPA to conclude that
the "object of the statute's solicitude—what it regulates and protects—is those forced to labor
within the United States." *Id.* Thus, "the focus and the touchstone of the territoriality inquiry of
the TVPA is where the forced labor occurred and to where the victims were trafficked, and not
from where the victims were trafficked or whether some of the means used to compel the labor
occurred abroad." *Id.* at 7.

In line with *Morrison* and *Tanedo*, the focus of § 512(f) is not where the fraudulent
misrepresentation originated, rather where the reliance, wrongful removal, and the resulting
injury occurred. The text of § 512(f) specifically provides remedy for the party "who is injured
by such misrepresentation, as the result of the service provider relying upon such
misrepresentation in removing or disabling access to the material or activity claimed to be
infringing, or in replacing the removed material or ceasing to disable access to it." 17 U.S.C.
§ 512(f). The object of § 512(f), titled "Limitations on liability relating to material online[,]" is
to not only regulate the removal of digital content, but also to protect the liability of web service
providers. *See id.*

Here, the object of § 512(f) involves Automattic's removal of the article from WordPress,
or potential threat of legal liability under the DMCA, both which occurred or would have
occurred in California. Like in *Tanedo*, the application of the statute is not extraterritorial

The left margin reads vertically.United States District Court
Northern District of California

because the object of § 512(f) of the DMCA, the prohibition on misrepresentations to effect the removal and liability relating to digital material, is present.  Moreover, key elements of the cause of action were performed in California.  The material at issue was hosted by Automattic, a California corporation, and Defendant's takedown notice was directed to Automattic in the California.  Automattic's reliance on Defendant's misrepresentation and resulting injury also both occurred in California.

Further, this reasoning is consistent with *Crunchyroll*, where this Court held that copyright infringement that commenced abroad but was complete in the United States was not wholly extraterritorial, and thus, the Copyright Act covered the defendant's conduct.  *See Crunchyroll*, 2014 WL 1347492, at *17.  Because the object of the Copyright Act is to protect copyrighted material that is published, and because the material at issue in that case was published in the United States, the infringement was not wholly extraterritorial.  *Id.*; *see also Shropshire v. Canning*, 809 F. Supp. 2d 1139, 1146 (N.D. Cal. 2011) (copyright laws apply where alleged infringement commenced abroad but culminated in the United States through YouTube servers in California).

### c.  Remaining *Eitel* Factors

Having found that the sufficiency of the complaint and merits of the § 512(f) claim weigh in favor of default judgment, the Court considers the remaining *Eitel* factors.  Because Defendant has failed to respond to the complaint or otherwise appear in this action, Plaintiffs will be left without a remedy, and therefore prejudiced, if default judgment is not granted.  The sum of money at stake, while not insignificant, is justified by the evidence proffered by Plaintiffs establishing damages, as discussed further below.  Defendant was properly served, and there is no indication that default is due to excusable neglect.  Defendant could conceivably dispute some of the material facts if he were to appear, but he has failed to do so, and the communications between Plaintiffs and Defendant—which would likely be the key evidence in any such dispute—are properly before the Court.  Finally, while there is a strong public policy favoring the resolution of disputes on the merits, that is not possible in this case because Defendant has

failed to appear.  Accordingly, the Court finds that the *Eitel* factors weighs in favor of default judgment.

### iii.    Damages

Section 512(f) provides that any person who makes knowing, material misrepresentations in filing a DMCA takedown notice "shall be liable for any damages, including costs and attorneys' fees[] incurred by the alleged infringer . . . or by a service provider . . . ."  17 U.S.C. § 512(f).  The Court previously determined that Plaintiffs proof of damages was insufficient and requested supplemental evidence.  Plaintiffs have filed supplemental declarations supporting their claims to damages under § 512(f), including: (1) time and resources expended in dealing with the takedown notice; (2) damages for reputational harm; (3) damages for Hotham's emotional harm; (4) damages for Hotham's chilled speech; and (5) costs and attorneys' fees incurred by Automattic.  Hotham requests $4,960 for lost time, reputational harm, emotional distress, and chilled speech.  Hotham Supp'l Decl. (Dkt. 27) ¶ 16; Compl. ¶ 40.  Automattic requests $8,860 for lost time, costs of media relations, and reputational harm.  Sieminski Supp'l Decl. ¶ 28.  Plaintiffs also request $22,264 for attorneys' fees.  Gratz Supp'l Decl. (Dkt. 26) ¶ 13.

### a.    Expenditure of Resources Dealing with Takedown Notice

Hotham claims that he spent "substantial time corresponding" with Automattic representatives about his permission to publish the content in the Press Statement, and then regarding the counter-notice he filed in accordance with the DMCA.  *See* Hotham Decl. (Dkt. 22-7) ¶ 6.  General Counsel for Automattic, Paul Sieminski, states that the company "spent significant staff time and resources in reviewing [the] takedown notices, disabling access to the posts, notifying Hotham, reviewing Hotham's response, dealing with press inquiries surrounding the takedown and reinstating of the post, and ultimately pursuing this litigation."  Sieminski Decl. ¶ 11.  Plaintiffs contend that this use of time and resources in response to Defendant's knowing misrepresentation under § 512 entitles them to damages.  Pls.' Mot. at 9.

This district construes damages under § 512(f) broadly, as the statute's use of "any damage" in its language "suggests strong Congressional intent that recovery be available for

United States District Court
Northern District of California

damages even if they do not amount to . . . substantial economic damages." *Lenz v. Universal Music Corp.*, No. 5:07-cv-03783-JF, 2013 WL 271673, at *9 (N.D. Cal. Jan. 24, 2013) (quoting *Lenz v. Universal Music Corp.*, No. C 07-3783 JF, 2010 WL 702466, at *10 (N.D. Cal. Feb. 25, 2010)). In *Lenz*, the plaintiff sought damages for an estimated ten hours spent obtaining counsel and sending notices from her own computer when her video was removed from YouTube due to a DMCA takedown notice. *Id.* In an order denying cross motions for summary judgment, the court acknowledged the apparent lack of authority "indicat[ing] definitively whether [the plaintiff] may recover for the time and resources that she herself expended in attempting to have her video reinstated under the DMCA's procedures[,]" but noted that permitting such recovery would be consistent with the construction of damages under the statute contemplated by Congress. *Id.* The court went on to suggest that the minimal expenses in "electricity to power her computer, internet and phone bills, and the like" expended by Lenz in dealing with the takedown notices, were potentially recoverable under § 512(f). The court did not specifically address whether Lenz could recover for her lost time and resources. *Id.* Finding that "actual expenses or economic losses of some minimum value [were] not necessary under the statute[,]" the court held that the fact "Lenz incurred *some* damages as defined under the statute" was sufficient to survive summary judgment. *Id.* at *8 (quoting *Lenz*, 2010 WL 271673, at *11−13).

Here, Plaintiffs' recovery of damages for time and resources incurred in dealing with Defendant's takedown notices is consistent with the *Lenz* court's interpretation of § 512(f). Like in *Lenz*, Plaintiffs expended time researching and working on their computers and telephones, and thus incurred at least minimal expenses in "bills, and the like." *Id.* Recovery of damages for lost time and resources is also consistent with the legislative intent of § 512(f) in deterring knowingly false allegations of infringement because it gives wrongfully accused internet users the incentive to bring a claim. *Id.* at *10.

Plaintiffs' initial evidence regarding the expenditure of resources, however, was too general and ambiguous. Instead of attempting to quantify the resources each Plaintiff actually expended in dealing with Defendant's takedown notices, Plaintiffs merely presented evidence

United States District Court
Northern District of California

that they spent "substantial" time and resources.  Hotham Decl. ¶ 6; Sieminski Decl. ¶ 11.

Plaintiffs did not attempt to estimate the amount of damages that should granted for the

expenditure of resources, instead estimating aggregate values of damages for time, resources,

reputational harm, and chilled speech.  Hotham Decl. ¶ 15; Sieminski Decl. ¶ 11.  At the July 11

hearing, the Court requested a more specific explanation of Plaintiffs' time and resources spent

responding to Defendant's takedown notices.

Plaintiffs have each submitted supplemental declarations regarding their damages.

Hotham declares that he spent approximately sixteen hours researching the validity of the

takedown notice, determining how to proceed, and responding to media inquiries[3] related to the

incident in the weeks following Defendant's submission of the takedown notice.  Hotham Supp'l

Decl. ¶¶ 3−4. Based on the time he spends on freelance articles and compensation he has

received for such work, Hotham estimates the value of that time to be $360.  *Id.* ¶¶ 6−7.  The

Court finds this estimate to be reasonable.  Hotham requests an additional "$600 in lost work"

based on the "significant distraction from freelance work [he] would normally be doing," caused

by news coverage and legal disputes related to this case.  *Id.* ¶¶ 5, 7.  Hotham does not explain

how he reached this number, but at the same rate as the time Hotham lost in initially responding

to the takedown request, it represents approximately 27 hours of Hotham's time.  The underlying

facts of this case spurred significant media coverage and led to the present litigation, which has

been pending for nearly a year.  The Court finds Hotham's supplemental declaration sufficient to

support his claim that he has suffered $960 in lost work and time spent as a result of Defendant's

takedown request.

Automattic submitted a supplemental declaration of its general counsel, Paul Sieminski.

Automattic seeks to recover for the time three employees spent responding to Defendant's

---

[3] The Court finds no reason to exclude time responding to media inquiries from Plaintiffs'
damages, where such inquiries were "the result of [Automattic] relying upon [Defendant's]
misrepresentation in removing or disabling access to the material . . . claimed to be infringing."
*See* 17 U.S.C. § 512(f); *see also Lenz*, 2013 WL 271673, at *9 (construing § 512(f)'s damages
provision broadly).

United States District Court
Northern District of California

takedown notices and responding to related press inquiries, including ten hours by Sieminski, six hours by Jenny Zhu, a full time in-house attorney, and six hours by Phil Crumm, a full time support engineer. Sieminski Supp'l Decl. ¶¶ 8−16. Automattic calculated its damages for these employees' lost time based on their salaries (submitted under seal) and a standard 2,000 hour year. *See id.* The total amount is $1,860. *Id.* ¶ 28. This approach is reasonable: the salaries that Automattic pays these employees represents the value of their time to the company, and the time they spent as a result of Defendant's takedown notices was time they could not spend on other projects.[4] Automattic may recover the damages it seeks based on its employees' time.

Automattic also seeks to recover for time spent by its outside public relations firm, Brew Media Relations ("Brew"). *See id.* ¶¶ 17−22. Automattic pays Brew a monthly retainer rather than on an hourly basis. *Id.* ¶¶ 19. Steiner's Supplemental Declaration provides the approximate amount of time that Brew spends per month on issues for Automattic, and the approximate amount of time Brew's employees spent as a result of Defendant's takedown notices. *Id.* ¶ 20. Based on these estimates, Automattic seeks damages equal to a percentage of the monthly retainer (submitted under seal) that it pays Brew. Without more detail regarding Brew's work and billing arrangements, however, it is not clear that the time Brew spent on the takedown notices represents any loss to Automattic. But for Defendant's takedown notices, would Brew have provided other benefits to Automattic instead of dealing with the fallout of Defendant's notices? Would Automattic have paid less, or been able to reduce its retainer for future billing cycles? The evidence Automattic has submitted leaves these questions unanswered. The damages Automattic claims for Brew's time are therefore speculative and should be denied.

### b. Damages for Reputational Harm

Hotham states that Defendant's fraudulent takedown notice has been "substantially harmful to [his] reputation for journalistic integrity[,]" that it comes during his "formative time

---

[4] To the extent that damages for Sieminski and Zhu's time could be construed as a request for attorneys' fees, the Court finds that their time and compensation was reasonable under the "lodestar" analysis applicable to attorneys' fees, discussed in more detail below in the context of Automattic's outside counsel's fees.

as a journalist[,]" and that as a result, it has been "more difficult to find work."  Hotham Decl.

¶¶ 12, 14.  Automattic also alleges that the removal of lawful content compelled by Defendant's

fraudulent takedown notice caused "damages to [Automattic's] reputation for allowing its users

to use WordPress.com for any lawful purpose."  Sieminski Decl. ¶ 15.

Plaintiffs make no real effort to justify the values they have assigned to this purported

reputational harm.  They are, based on the evidence submitted, speculative.  Such damages are

therefore unavailable.

### c.   Hotham's Emotional Distress

Hotham's Supplemental Declaration estimates "the emotional harm from this debacle to

be $2000," because "[t]his whole process has been incredibly upsetting and demoralizing."

Hotham Supp'l Decl. ¶¶ 8, 11.  While the Court sympathizes with Hotham's undoubtedly

unpleasant experience, the Court is aware of no authority holding that emotional distress

damages are available under § 512(f).

### d.   Hotham's Chilled Speech

Hotham alleges that Defendant's fraudulent takedown notices were an abuse of the

DMCA process that wrongfully chilled Hotham's speech.  Mot. at 13.  In *Lenz*, the court held

that the plaintiff could not demonstrate damages based upon the chilling of her free speech.

*Lenz*, 2013 WL 271673, at *8.  The court noted that nominal damages are only awarded for

chilled speech through *government* action, and that there is no authority extending the reach of

such cases.  *Id.*

Plaintiffs attempt to distinguish *Lenz* by noting that the plaintiff "did not care" that

YouTube did not want to host her video, and therefore, did not show that her speech had been

chilled.  Mot. at 13.; *see id.*  Plaintiffs' distinction is insufficient.  Because all parties in the

instant case are private actors, Hotham's claim for chilled speech is analogous to *Lenz*.  Thus,

Hotham is not entitled under the DMCA to damages for his chilled speech as a result of

Defendant's takedown notices.

e.   Automattic's Attorneys' Fees and Costs of Suit

Automattic is entitled to recover a reasonable award of attorneys' fees under the DMCA. 17 U.S.C. § 512(f).  To determine a reasonable award of attorneys' fees, courts employ the "lodestar" figure, which is calculated by multiplying the number of hours reasonably expended on the litigation by the reasonable hourly rate.  *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)).

To determine the number of hours reasonably expended on the litigation, courts must consider whether "the time could reasonably have been billed to a private client."  *Moreno v. City of Sacramento*, 534 F.3d 1106, 1111 (9th Cir. 2008).  The party seeking fees "has the burden of submitting billing records to establish that the number of hours it has requested [is] reasonable."  *Gonzales*, 729 F.3d at 1202; *see also Hensley*, 461 U.S. at 437 ("the fee applicant bears the burden of . . . documenting the appropriate hours expended").

"Once the district court sets the compensable hours, it must determine a reasonable hourly rate considering the experience, skill, and reputation of the attorney requesting fees."  *Schwarz v. Sec'y of Health & Human Servs.*, 73 F.3d 895, 908 (9th Cir. 1995) (internal quotations omitted).  Courts "should be guided by the rate prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation."  *Id.*  "Importantly, the fee applicant has the burden of producing 'satisfactory evidence' that the rates he requests meet these standards."  *Gonzalez*, 729 F.3d at 1206 (citations omitted).

The evidence initially submitted in support of Automattic's request for attorneys' fees was insufficient.  Automattic relied solely on the chart presented by its counsel, Joseph Gratz, outlining "major tasks" performed in connection to Plaintiffs' case, but failing to indicate which attorney worked on each task.  Gratz Decl. ¶ 8.  At the July 11 hearing, the Court requested more detailed justification of  Automattic's requested award of fees.

Automattic has now submitted a more comprehensive explanation of its attorneys' fees, including billing records for the three attorneys who worked on this case.  *See* Gratz Supp'l Decl. Ex. C.  The Court has reviewed these records and finds that the time spent prosecuting this action

was reasonable.[5]  Automattic has also submitted data from the American Intellectual Property Law Association indicating that the average billing rate for intellectual property attorneys in San Francisco is $547 per hour.  *Id.* Ex. A.  Aggregated across the three attorneys who worked on the case, Automattic seeks to recover at a rate of $418.50 per hour, well under the local average rate.  *See id.* Ex. C.  The only attorney on the team who billed at a higher rate than the local average was Michael Page, a partner, who billed at $680 per hour but worked on this case for less than one hour total.  *Id.*  Gratz's supplemental declaration also attests to the experience and skill of Automattic's attorneys.  Gratz Supp'l Decl. ¶¶ 5−8.  The undersigned therefore recommends that Automattic recover in full the $22,264 it requests for attorneys' fees.

## IV.    CONCLUSION

For the foregoing reasons, it is recommended that the Motion for Default Judgment be GRANTED, and that judgment be entered for Plaintiffs.  The undersigned recommends awarding damages of $960 for Hotham's lost work and time, $1,860 for time spent by Automattic's employees, and $22,264 for Automattic's attorneys' fees, for a total of $25,084.  This case shall be reassigned to a United States District Court judge.  Any objections to this Report and Recommendation shall be filed within fourteen (14) days.

Dated: October 6, 2014

_____
JOSEPH C. SPERO
United States Magistrate Judge

---

[5] Automattic does not seek to recover a significant amount of fees for the time spent preparing supplemental declarations to correct the deficiencies identified by the Court at the July 11 hearing.  The only time entry related to that process is for 0.1 hours of Michael Feldman's time spent strategizing regarding "damages supplemental declarations."  Gratz Supp'l Decl. Ex. C at 4.  Because preparing sufficient declarations in the first place would likely have taken more time than Automattic's counsel spent on their original deficient submissions, the Court finds that this minimal request related to the supplemental declarations is reasonable.